IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NANETTE SUE LANEY,

      Plaintiff,

      vs.                          Civ. No. 24-541 DHU/JFR

LELAND DUDEK, Acting Commissioner,
Social Security Administration,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 10)[2] filed July 22, 2024, in connection with Plaintiff's *Motion to Reverse and Remand With Supporting Memorandum,* filed November 19, 2024.  Doc. 14.  On February 19, 2025, Defendant filed a Response.  Doc. 20.  On March 7, 2025, Plaintiff filed a Reply.  Doc. 25.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's Motion is not well taken and recommends that it be **DENIED**.

## I. Background and Procedural Record

Plaintiff Nanette Sue Laney ("Ms. Laney") alleges that she became disabled on August 19, 2011, at the age of fifty-two years and four months, because of severe chemical

---

[1] On March 4, 2025, United States District Judge David H. Urias entered an Order of Reference referring this case to the undersigned to conduct hearings, if warranted, including evidentiary hearings and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.  Doc. 21.

[2] Hereinafter, the Court's citations to Administrative Record (Doc.10), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

sensitivities, post-traumatic stress disorder ("PTSD"), and back/neck injury.  Tr. 71.  Ms. Laney

has a Masters in Education and has worked as a program coordinator (various nonprofits);

teacher and tutor (public schools); and biological technician (U.S. Forest Service).  Tr. 188-89,

228-238.  Ms. Laney stopped working on August 19, 2011, because of her medical conditions.

Tr. 188.  Ms. Laney's date of last insured is June 30, 2015.[3]  Tr. 201.

On August 26, 2013, Ms. Laney protectively filed an application for Social Security

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. § 401 *et seq*.  Tr. 170-74, 175-76.  On February 19, 2014, Mr. Laney's application was

denied upon initial review.  Tr. 70, 71-84.  On August 1, 2014, it was denied at reconsideration.

Tr. 85-99, 100.  On August 18, 2014, Ms. Laney requested a hearing before an Administrative

Law Judge ("ALJ"), which was held on May 19, 2016, before ALJ Michelle K. Lindsay.  Tr. 34-

68, 116-17.  Ms. Laney was represented at the hearing by Attorney Gary Martone.[4]  *Id.*  On

September 29, 2016, ALJ Lindsay issued an unfavorable decision.  Tr. 34-68.  On September 7,

2017, the Appeals Council issued its decision denying Ms. Laney's request for review and

upholding the ALJ's final decision.  Tr. 1-5.

On November 15, 2017, Ms. Laney timely filed a Complaint seeking judicial review of

the Commissioner's final decision.  Tr. 574-76 (USDC NM Civ. No. 17-1062 JHR, Doc. 1).  On

February 12, 2019, Magistrate Judge Jerry H. Ritter, Presiding by Consent, remanded

Ms. Laney's case for further consideration.  Tr. 577-87.  Judge Ritter concluded that the ALJ

erred as a matter of law by failing to resolve an actual conflict between Mr. Laney's RFC and the

---

[3] To receive benefits, Ms. Laney must show she was disabled prior to her date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[4] Ms. Laney is represented in these proceedings by Attorney Katherine Hartung O'Neal.  Doc. 1

jobs identified by the VE, and by neglecting to make the required factual finding of whether or not the jobs at issue were "significant." *Id.*

On remand, ALJ Lindsay held a second hearing on September 9, 2020. Tr. 532-42. On October 7, 2020, ALJ Lindsay issued an unfavorable decision. Tr. 503-24. On September 24, 2021, the Appeals Council issued its decision denying Ms. Laney's request for review and upholding the ALJ's final decision. Tr. 496-502.

On November 15, 2021, Ms. Laney timely filed a second Complaint seeking judicial review of the Commissioner's final decision. *See* USDC NM Civ. No. 21-1096 SCY (Doc. 1). On October 17, 2022, Magistrate Judge Steven C. Yarbrough, Presiding by Consent, remanded Ms. Laney's case for further consideration. Tr. 1036-50. Judge Yarbrough concluded that the ALJ failed to follow the proper legal standards when considering the mental health opinions. *Id.*

On remand, ALJ Jennifer Fellabaum held a third hearing on July 11, 2023. Tr. 968-99. On August 18, 2023, ALJ Fellabaum issued an unfavorable decision. Tr. 943-59. On March 6, 2024, the Appeals Council issued its decision denying Ms. Laney's request for review and upholding the ALJ's final decision. Tr. 936-40.

On May 30, 2024, Ms. Laney timely filed a third Complaint seeking judicial review of the Commissioner's final decision. Doc. 1. Ms. Laney argues that the ALJ failed to follow the mandate from Magistrate Judge Yarbrough to follow the proper legal standards in evaluating the opinions regarding Ms. Laney's ability to do work-related mental activities. Doc. 14 at 11-19. Ms. Laney also argues that the ALJ failed to resolve a conflict between the VE's testimony and the DOT related to the GED reasoning level three job of mail clerk and the ALJ's RFC restriction to simple work. *Id.* at 19-25.

## II.  <u>Applicable Law</u>

### A.    <u>Disability Determination Process</u>

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months".  42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.
>
> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.
>
> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.
>
> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.    Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371,

1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency.  *Langley*, 373 F.3d at 1118.

### III.  Analysis

The ALJ determined that Ms. Laney met the insured status requirements of the Social Security Act through June 30, 2015, and that she had not engaged in substantial gainful activity during the period from her alleged onset date of August 19, 2011, through her date last insured of June 30, 2015.  Tr. 948.   The ALJ found that Ms. Laney had severe impairments of chemical sensitivity, depressive disorder, PTSD, and chronic Lyme disease.  *Id.*  The ALJ further found that Ms. Laney had nonsevere impairments of right wrist fracture and hypothyroidism.  Tr. 949.  The ALJ found that Ms. Laney's alleged sensitivity to wireless signals and electromagnetism; carpal tunnel syndrome; head, back, and neck injuries; babesiosis; reactive airway disorder; liver insufficiency; noise sensitivity; elbow tendinitis in both arms; and rotator cuff injury were not established by objective medical evidence and accordingly are not medically determinable impairments.  *Id.*  The ALJ determined that Ms. Laney's impairments did not meet or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 950-51.  Accordingly, the ALJ proceeded to step four and found that during the

relevant period of time Ms. Laney had the residual functional capacity to perform light work as

defined in 20 CFR §§ 404.1567(b) except that

> she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or
> scaffolds, or be exposed to unprotected heights, hazardous machinery, or have
> concentrated exposure to extreme cold, heat, humidity, wetness, or environmental
> or pulmonary irritants; she cannot work directly with chemical cleaning products;
> she cannot work in new building construction or remodeling construction; she
> cannot operate a motor vehicle for commercial purposes; she can perform simple,
> routine tasks, with no fast-paced assembly line work; she can make simple work
> decisions; she can occasionally interact with co-workers, supervisors, and the
> general public; and her work should be performed in the same location every day.

Tr. 951-57.  The ALJ determined that Ms. Laney was unable to perform her past relevant work,

but considering her age, education, work experience, and residual functional capacity, that

through the date last insured there were jobs that existed in significant numbers in the national

economy Ms. Laney could perform.[6]  Tr. 957-58.  The ALJ determined, therefore, that

Ms. Laney was not disabled.  Tr. 958-59.

### A.     Relevant Medical Evidence Related to Ms. Laney's Ability To Do Work-Related Mental Activities

#### 1.     Robert Krueger, Ph.D.

On December 4, 2013, Ms. Laney presented to Robert Krueger, Ph.D., for psychological

evaluation pursuant to a referral by Disability Determination Services.  Tr. 300-04.  Ms. Laney

reported an extensive medical history, including chemical sensitivities and environmental illness

affecting multiple organ systems, PTSD, chronic breathing problems, reactive airway disorder,

chronic pain and fatigue, tendonitis, back injury, Lyme disease, multiple parasitic infections,

body temperature dysregulation, rotator cuff injury, and radial distal fracture to her right wrist.

---

[6] The VE expert identified representative occupations of Mail Clerk (DOT code 209.687-026, light exertion, unskilled, SVP 2, 47,000 jobs nationally); Office Helper (DOT code 239.567-010, light exertion, unskilled, SVP 2, 42,000 jobs nationally); Tagger (DOT code 229-587-018, light exertion, unskilled SVP 2, 30,000 jobs nationally).  Tr. 958.

*Id.* Specific to her alleged mental impairments, Ms. Laney reported stress related to her chronic health problems, sleep disturbance and chronic fatigue, anxiety, disturbing memories, hypervigilance, avoidant behavior, difficulties with concentration and memory, and depression. *Id.* Ms. Laney also reported, *inter alia*, that she is able to care for herself, enjoys hiking, and has less social interaction because she does not know many people in New Mexico. *Id.*

Dr. Krueger observed that Ms. Laney was well oriented and cooperative, showed no evidence of hypomania or mania, was well educated with no evidence of a cognitive disorder, was rational with her verbal presentation and displayed very good verbal skills, had clear speech at an average rate, and tended to get sidetracked in great detail. *Id.* Dr. Krueger administered a Beck Depression Inventory which suggested significant problems with depression "at this time." *Id.* Dr. Krueger also administered a Digit Span test to assess Ms. Laney's memory skills. *Id.* Dr. Krueger noted that Ms. Laney obtained a score suggesting that she is functioning within the average range in terms of her immediate recall memory skills. *Id.*

Dr. Krueger made Axis I diagnoses of depressive disorder NOS and PTSD, unspecified (provisional); Axis IV diagnoses of psychosocial stressors related to chronic medical issues, loss of former activities, and lack of income; and an Axis V GAF score of 50 (recent).[7] *Id.*

Dr. Krueger summarized and recommended as follows:

> Ms. Laney reported an extensive medical history and stated that she has had multiple chemical sensitivities and symptoms of environmental illness for many years. She reported having a variety of other chronic medical issues, and her medical records should be consulted for specific information. Concerning her emotional functioning, Ms. Laney reported having a history of problems with anxiety and described having symptoms that are consistent with PTSD. She also

---

[7] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) at 32. A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) at 34. (*Id.*)

reported having some history of depression and obtained a highly elevated score on the Beck Depression Inventory. Concerning her cognitive functioning, Ms. Laney displayed very good verbal skills and there was no particular evidence of a major cognitive disorder. She stated that she does notice problems with concentration and memory, but she scored at an average level on a Digit Span test. Concerning alcohol or drug use, Ms. Laney stated that she has not had a substance abuse problem.

The results of the current evaluation indicate that Ms. Laney has multiple impairments, and she does have significant functional impairment. She appears to have the capacity to understand, remember, and follow simple work instructions with minimal impairment and complex or detailed instructions with moderate impairment. Because of chronic fatigue and chronic pain along with other medical issues, Ms. Laney is likely to have marked impairment with maintaining pace and persistence in work environments. She stated that at times she sleeps 12-16 hours per day. In her current condition she can be expected to have marked impairment with adjusting to changes in work environment. Because of ongoing emotional difficulties Ms. Laney is likely to have moderate impairment in some relationships with coworkers, supervisors, and the general public. In her current condition she can be expected to have at least moderate impairment with traveling to distant places alone. Alcohol or drug use is not a factor in this case. Because of ongoing medical issues, along with chronic emotional difficulties, Ms. Laney can be expected to have moderate impairment with being aware of and reacting appropriately to dangers in work environments. Ms. Laney reported having long-term medical issues. Her emotional difficulties also can be expected to persist for more than one year. At the present time Ms. Laney is capable of managing her own financial benefits.

Tr. 303.

The ALJ accorded Dr. Krueger's opinion little weight. Tr. 955. The ALJ explained that

Dr. Krueger has an examining though not a treating relationship with the claimant. In terms of consistency with the record, this opinion is generally inconsistent with the normal memory (Ex. 5F/5) discussed above;[8] the normal thought process, thought content, and attention (Exs. 11F; 16F)[9] also discussed above; the good

---

[8] Exhibit 5F contains treatment notes by James Cardasis, D.O. Tr. 316-20. On June 5, 2014, Ms. Laney presented to James Cardasis, D.O., at HCH Penasco Rural Health Clinic. Tr. 319-20. Ms. Laney reported not having seen a doctor "in about a decade." *Id.* Ms. Laney complained of tick-borne relapsing fever, hypothyroidism, PTSD, and fracture to distal end of radius and ulna. *Id.* On physical exam, Dr. Cardasis noted as to Ms. Laney's mental status that she had good judgment, "normal mood and affect and active and alert," orientation to time, place, and person; and "recent memory normal and remote memory normal." Tr. 320.

[9] Exhibits 11F and16F contain treatment notes by Debra Solomon, M.D. *See* Section III.A.4., *infra*.

concentration (Ex. 4F)[10] at the consultative medical exam; and the fact that at Dr. Krueger's own exam (Ex. 3F), the claimant did have a tendency to get side-tracked, but there was no evidence of a cognitive disorder, she had average performance on digit span, and thought process and content were normal.

*Id.*

## 2.    Donald K. Gucker, Ph.D.

On February 19, 2014, nonexamining State agency psychological consultant Donald Gucker, Ph.D., reviewed the medical evidence record at the initial level of review. Tr. 76-77, 80-82. Dr. Gucker prepared a Psychiatric Review Technique ("PRT")[11] and rated the degree of Ms. Laney's functional limitation in activities of daily living as *mild*; in difficulties in maintaining social functioning as *moderate*; in maintaining concentration, persistence, or pace as *moderate*, and in repeated episodes of decompensation as *none*. Tr. 77.

Dr. Gucker also prepared a Mental Residual Functional Capacity Assessment ("MRFCA") in which he found in Section I that Ms. Laney was *not significantly limited* in her ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) make simple work-related

---

[10] Exhibit 4F contains a consultative medical exam prepared by Jennifer Como, M.D. Tr. 308-314. On January 11, 2014, Ms. Laney presented to Dr. Como for physical evaluation. *Id.* Dr. Como notes, *inter alia*, that Ms. Laney "was alert and had good eye contact and fluent speech. The claimant's mood was appropriate and the claimant had clear thought processes. Claimant's memory was normal and concentration was good. The claimant was oriented to time, place, person and situation." Tr. 311.

[11] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

decisions; (8) ask simple questions or request assistance; and (9) maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness.  Tr. 80-82.  Dr. Gucker

found that Ms. Laney was *moderately limited* in her ability to (1) understand and remember

detailed instructions;[12] (2) carry out detailed instructions;[13] (3) maintain attention and

concentration for extended periods;[14] (4) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods;[15] (5) interact appropriately with the general

public;[16] (6) accept instructions and respond appropriately to criticism from supervisors;[17] (7) get

---

[12] As to this finding, Dr. Gucker explained that Ms. Laney

> [m]ay have moderate limitations due to preoccupation with her physical condition, however psych CE opined that she is a very well-educated person, during the interview she displayed very good verbal skills, and there was no particular evidence of a cognitive disorder.  She did report some difficulties with concentration and memory.  To briefly assess[] memory skills she was administered the digit span test, and on this test she was able to accurately repeat five digits forward to six digits backwards, a score within the average range.  Claimant presented a driver's license as form of ID. In interview she was well oriented and was cooperative.  Claimant was able to relate a detailed history including much detailed information.  The CE opined that claimant appeared to have the capacity to understand, remember, and follow simple work instructions with minimal impairment in complex or detailed instructions with moderate impairment.

Tr. 80.

[13] As to this finding Dr. Gucker explained that Ms. Laney

> has preoccupation with her physical condition and would have moderate limitations with attention and concentration.  CE opined that because of chronic fatigue and chronic pain along with other medical issues claimant is likely to have marked impairment with maintaining pace and persistence in work environments, however CE combines both psychological and physical issues in reaching conclusion and does not isolate the psychological issues.

Tr. 81.

[14] *Id.*

[15] *Id.*

[16] Dr. Gucker explained that "CE opined that because of ongoing emotional difficulties claimant is likely to have moderate impairment in some relationship with coworkers, supervisors, and the general public."  Tr. 81.

[17] *Id.*

11

along with coworkers or peers without distracting them or exhibiting behavioral extremes;[18]
(8) respond appropriately to changes in the work setting;[19] (9) be aware of normal hazards and
take appropriate precautions;[20] (10) travel to unfamiliar places or use public transportation;[21] and
(11) set realistic goals or make plans independently of others.[22]

Dr. Gucker provided additional explanation that

The clmt attended a Psych CE on 12/04/2013 where she reported having a history
of difficulties with PTSD. The clmt stated that she was exposed to abusive behavior
from her father. She reported being exposed to stress from her chronic health
problems. She stated she had disturbing memories about her mother's illness and
death. The clmt reported some difficulties with concentration and memory. On the
Beck Depression Inventory, she obtained a score of 30 which suggests problems
with depression currently.

The clmt reported having problems with anxiety, reported having sleep
disturbances, disturbing memories, tendencies for hypervigilance, and tendencies
to avoid certain situations that arouse anxiety.

Speech was clear, she displayed very good verbal skills, and there was no evidence
of a cognitive disorder. The clmt self-reported some difficulties with concentration
and memory. On Digit Span testing, the clmt was able to accurately repeat 5 digits
forward and 6 digits backwards. She obtained a scaled score of 10 on Digit Span
which was within the average range.

Clmt reports making easy meals, doing laundry, and wet mops. She goes out 2-3
times a day to walk her dog, shops, and states she has a hard time tracking her bills.
She talks with friends on the phone, goes to Temple, acupuncture, and sees a
naturopath. She states written instructions are better than verbal. She reports
trouble with stress.

---

[18] *Id.*

[19] Dr. Gucker explained that "CE opines a moderate impairment with traveling to distant places alone and because of
ongoing medical issues along with chronic emotional difficulties she can be expected to have moderate impairment
with being aware of and reacting appropriately to dangers in work environment." Tr. 82.

[20] *Id.*

[21] *Id.*

[22] *Id.*

Tr. 82.  Based on his findings and explanations, Dr. Gucker assessed in Section III that

Ms. Laney "can understand, remember, and carry out simple instructions, make simple decisions,

attend and concentrate for two hours at a time, interact adequately with co-workers and

supervisors, and respond appropriately to changes in a routine work setting."  *Id.*

The ALJ accorded Dr. Gucker's opinion significant weight.  Tr. 955-56.  She explained

that

> State psychological consultants are non-treating, non-examining sources who,
> however, possess extensive program knowledge.  In terms of consistency with the
> record, the limitation to simple instructions and decisions is consistent with the
> normal memory (Ex. 5F/5) discussed above; the normal thought process, thought
> content, and attention (Exs. 11F; 16F) also discussed above; the good concentration
> (Ex. 4F) at the consultative medical exam; and the fact that at the consultative
> psychological exam (Ex. 3F), the claimant did have a tendency to get side-tracked,
> but there was no evidence of a cognitive disorder, she had average performance on
> digit span, and thought process and content were normal.  This proposed limitation
> was adopted here, and I also included a proscription against fast-paced assembly
> line work to accommodate both her mental impairment and her fatigue.  On social
> limitations, the consultants are somewhat internally inconsistent, saying at one
> point that there would be such limitations, but later saying that the claimant could
> interact adequately with others.  I have included social limitations above, and no
> greater or additional social limitations are warranted given the claimant's
> cooperativeness, normal eye contact, normal speech, and good verbal skills.  (Exs.
> 3F; 4F.)  However, in consideration of the claimant's concerns about being around
> people due to her chemical sensitivities, I determined that a limitation to no more
> than occasional interaction with others is appropriate.  The proposed limitation on
> workplace changes is consistent with all of these evidentiary considerations, and
> was essentially adopted here.  In this way, I arrived at the mental component of the
> above residual functional capacity assessment.

Tr. 955-56.

### 3.    Carol Mohney, Ph.D.

On July 31, 2014, nonexamining State agency psychological consultant Carol Mohney,

Ph.D., reviewed the medical evidence record at reconsideration.  Tr. 91, 94-97.  Dr. Mohney

affirmed Dr. Gucker's initial assessment.  She explained

> At reconsideration, the claimant does not allege any new impairments. She states that chemicals make her sick. She lives in her car. The [medical] source listed on 3441[23] is actually a hostel with a local woman who provides herbs. Over the phone, the claimant states that she has gone back to Penasco Health Clinic.
>
> PENASCO HEALTH CLINIC
> 6/5/2014: Clmt "hasn't see[n] a Dr in about a decade." PE: Psych: Good judgment. Mental Status shows normal mood and affect and active and alert. Oriented x3. Memory normal.

Tr. 97. Dr. Mohney assessed "[t]here is no significant change noted. The initial assessment is affirmed as written." *Id.*

The ALJ accorded Dr. Mohney's opinion significant weight for the same reasons she accorded Dr. Gucker's opinion significant weight. Tr. 955 (*see* Section III.A.2., *supra*).

### 4.    Debra Solomon, M.D.

On September 30, 2014, Ms. Laney presented to Debra Solomon, M.D., for a psychiatric evaluation and medication management. Tr. 459-62. Ms. Laney reported "I believe I have PTSD." *Id.* Ms. Laney reported her physical challenges related to chemical/environmental sensitivities and resulting psychological issues. *Id.* Dr. Solomon noted various histories and conducted a mental status exam indicating oriented times three, articulate speech, no psychosis, and "OK" thought process, association, and recent/remote memory. *Id.* Dr. Solomon also indicated chronic suicidal ideation with no intent or plan and no hallucinations. *Id.* Dr. Solomon diagnosed Ms. Laney with PTSD.[24] *Id.*

---

[23] Form SSA-3441 is a Disability Report on Appeal. Tr. 247-51. There, Ms. Laney identified Muna Mouna as a healthcare provider from whom she received treatment for her alleged impairments. Tr. 248.

[24] On September 30, 2014, Dr. Solomon prepared a letter to referring physician James Cardasis, D.O., stating that Ms. Laney's long history of tick borne illnesses and severe environmental sensitivities had led her to losing housing, relationships, and jobs, and that she was currently living in her car and in a constant state of alert. Tr. 478. Dr. Solomon explained "I do think she has. . . PTSD" and stated she was referring Ms. Laney for case management for some help with housing and disability. *Id.*

Ms. Laney next saw Dr. Solomon on November 20, 2014.  Tr. 456-58.  Ms. Laney reported "doing ok."  *Id.*  Dr. Solomon similarly noted on mental status exam that Ms. Laney was oriented times three; her appearance was pleasant; her thought process, association, recent/remote memory, attention, judgment, and knowledge were "OK"; her speech was articulate; no psychosis; and no suicidal ideation or hallucinations.  *Id.*  Dr. Solomon indicated that Ms. Laney was on no medications and treated with plant based supplements.  *Id.* Dr. Solomon assessed PTSD "from ongoing trauma of exposure to toxins on top of old trauma during childhood."  *Id.*  Dr. Solomon noted that Ms. Laney "remains disabled by inability to find stable housing and work that are not toxic for her."  *Id.*

Ms. Laney saw Dr. Solomon on February 19, 2015, and reported her energy and sleeping were better.  Tr. 453-55.  Dr. Solomon noted on mental status exam that Ms. Laney was oriented times three; her appearance was pleasant; her thought process, association, recent/remote memory, attention, judgment, and knowledge were "OK"; her speech was articulate; no psychosis; and no suicidal ideation or hallucinations.  *Id.*  Dr. Solomon indicated that Ms. Laney was on no medications and treated with plant based supplements.  *Id.*  Dr. Solomon assessed that Ms. Laney was managing a lot better, but was still very physically and financially challenged. *Id.*

On February 24, 2015, Dr. Solomon prepared a letter to the Social Security Administration on Ms. Laney's behalf.  Tr. 477.  Dr. Solomon provided relevant professional background information; her diagnosis of Ms. Laney with moderate to severe PTSD; and explained how Ms. Laney's PTSD is exacerbated by recurrent homelessness, unemployment, and various health issues related to, *inter alia*, severe chemical sensitivities and allergies as reported by Ms. Laney.  *Id.*  Dr. Solomon concluded that

> [g]iven the complexity and severity of Nanette's health issues – including
> Environmental Illness/Multiple Chemical Sensitivity, chronic tick-born infections
> and PTSD – I expect that she will continue to experience significant challenges to
> finding and maintaining employment and housing, particularly since she has a
> history of housing instability and difficulty in finding employment that she can
> maintain due to her health.

Tr. 477.

On April 7, 2015, Ms. Laney presented to Dr. Solomon requesting a disability letter. Tr.

482. Dr. Solomon noted that Ms. Laney was doing pretty well with her herbal/plant regimen but

she was still without a place to live. *Id.* Dr. Solomon noted on exam that Ms. Laney's

appearance was pleasant; she was oriented times three; her thought process, association,

recent/remote memory, attention, judgment, and knowledge were "OK"; there was no evidence

of psychosis; no suicidal ideation or hallucinations; and Ms. Laney's speech was articulate. *Id.*

On the same date, Dr. Solomon prepared a *Medical Source Statement of Ability To Do*

*Work-Related Activities (Mental)* on Ms. Laney's behalf. Tr. 471-75. Dr. Solomon assessed that

since approximately 1993, Ms. Laney is *not significantly limited* in her ability to (1) make simple

work-related decisions; (2) interact appropriately with the general public or customers; (3) ask

simple questions or request assistance from supervisors; (4) accept instructions and respond

appropriately to criticism from supervisors; (5) get along with co-workers or peers without

unduly distracting them or exhibiting behavioral extremes; (6) maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness; (7) be aware of normal

hazards and take appropriate precautions; and (8) set realistic goals or to make plans

independently of others. *Id.* Dr. Solomon assessed that Ms. Laney is *moderately limited* in her

ability to (1) remember locations and work-like procedures; (2) understand and remember very

short and simple (one- or two-step) repetitive instructions or tasks; (3) carry out short and simple

(one- or two-step) instructions or tasks; (4) maintain attention and concentration for extended

16

periods (the approximately 2-hour segments between arrival and first break, lunch, second,

break, and departure) with four such periods in a workday; (5) sustain an ordinary routine

without special supervision; (6) work in coordination with or proximity to others without being

unduly distracted by them; and (7) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods. *Id.* Dr. Solomon assessed that Ms. Laney is

*markedly limited* in ability to (1) understand and remember detailed (3 or more steps)

instructions or tasks which may or may not be repetitive; (2) carry out detailed (3 or more steps)

instructions which may or may not be repetitive; (3) perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerances; (4) respond

appropriately to expected or unexpected changes in the work setting; and (5) travel in unfamiliar

places and/or to use public transportation. *Id.*

     Dr. Solomon further assessed that (1) the need to make quick and accurate, independent

decisions in problem solving on a consistent basis would increase the level of impairment

beyond those indicated; and that (2) Ms. Laney is the type of person for whom a routine,

repetitive, simple, entry-level job would serve as a stressor which would exacerbate instead of

mitigate her psychological symptoms in the workplace. *Id.* Dr. Solomon assessed that

Ms. Laney would be unable to work more than three or four times per month due to medically

determinable impairments and that her functional limitations have and/or will last for 12

continuous months at the assessed severity. *Id.*

     Dr. Solomon explained that

> Nanette suffers from moderate to severe PTSD. Her work disability, however, is
> primarily due to the ongoing environmental illness that causes her severe physical
> and cognitive symptoms whenever she is exposed to materials that are toxic to her.
> She is fully able to work with a flexible schedule and full accommodations for her

sensitivities, ideally working at home.  At present, she has no stable housing and cannot find a tolerable place to live where she could even consider basing her work.

*Id.*

Ms. Laney last saw Dr. Solomon on June 11, 2015.  Tr. 479-80.  Ms. Laney reported that "[t]his building threw me for a loop last time."  *Id.*  Dr. Solomon noted that Ms. Laney was having a medically difficult time, that she was housesitting in Dixon, and that she was working on developing her own place to stay that is not toxic.  *Id.*  Dr. Solomon noted on exam that Ms. Laney's appearance was pleasant; she was oriented times three; her thought process, association, recent/remote memory, attention, judgment, and knowledge were "OK"; there was no evidence of psychosis; no suicidal ideation or hallucinations; and Ms. Laney's speech was articulate.  *Id.*  Dr. Solomon assessed that Ms. Laney had continued resilience in coping with severe environmental illness.  *Id.*

The ALJ accorded Dr. Solomon's opinion, as a treating source, little weight. Tr. 955 (citing Ex. 15).[25]  The ALJ explained that

> [t]o begin with, her opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" because her own treatment notes reflect no memory testing, and as regards concentration, reflect only that attention and thought process were generally "OK." (Exs. 11F; 16F.)  Moreover, Dr. Solomon's opinion is "inconsistent with the other substantial evidence," specifically the normal memory (Ex. 5F/5) discussed above; the good concentration (Ex. 4F) at the consultative medical exam; and the fact that at the consultative psychological exam (Ex. 3F) discussed above, the claimant did have a tendency to get side-tracked, but there was no evidence of a cognitive disorder, she had average performance on digit span, and thought process and content were normal.

Tr. 955.

---

[25] Exhibit 15F contains Dr. Solomon's Medical Source Statement and her February 24, 2015, and September 30, 2014, letters.  Tr. 471-78.

5.     **Suzanne Lovelace, LPCC**

On November 23, 2014, Suzanne Lovelace, LPCC, prepared a letter on Ms. Laney's

behalf.  Tr. 469.  LPCC Lovelace states she has been treating Ms. Laney for PTSD since July 24,

2014, and describes Ms. Laney's reported symptoms related to multiple chemical sensitivities

and environmental illnesses.  *Id.*  LPCC Lovelace states that cannabis is helpful for managing

stress.  *Id.*

On March 30, 2015, LPCC Lovelace prepared a second letter on Ms. Laney's behalf.  Tr.

468.  LPCC Lovelace stated she had been treating Ms. Laney weekly since July 24, 2014, for

PTSD.  *Id.*  LPCC Lovelace described Ms. Laney's history and the work and focus of

psychotherapy.  *Id.*  LPCC Lovelace concluded that "PTSD, Environmental Illness, and Lyme

Disease are all long term debilitating illnesses and the expectation is that psychotherapy will

continue for many months, if not years, as this process helps Ms. Laney manage her stress to

some degree."  *Id.*

On May 10, 2016, LPCC Lovelace prepared a third letter on Ms. Laney's behalf.  Tr.

485.  LPCC Lovelace explained that Ms. Laney's PTSD was exacerbated by the passing of her

father and dog, and problems associated with completing her tiny house.  *Id.*  LPCC Lovelace

stated that Ms. Laney is an appropriate candidate for disability due to her continuing illness and

debilitation.  *Id.*

As to these letters, the ALJ stated:

Turning to the various medical source statements, Suzanne Lovelace, LPCC has
submitted statements which contain no functional limitations, but rather contain
findings on issues reserved to the Commissioner – that her symptoms "make[] it
impossible to perform in a job," for example.  (Exs. 13F; 18F.)  These are not
medical opinions and received no weight.

Tr. 954.

B.    **Arguments**

1.    **The Mandate and Evaluation of Mental Health Opinions**

Ms. Laney first argues that the ALJ's evaluation of Dr. Solomon's and Dr. Kruger's

opinions fails to follow the mandate found in Magistrate Judge Yarbrough's October 17, 2022,

Memorandum Opinion and Order remanding her case for further proceedings.  Doc. 14 at 11-19.

By way of background, in her previous appeal before this Court, Ms. Laney challenged ALJ

Lindsay's evaluation of Dr. Solomon's and Dr. Kruger's mental health opinions, a separate

opinion regarding her physical functioning, and evidence relating to stress, fatigue, and

subjective symptoms.  Tr. 1040 (USDC NM Civ. No. 21-1096 SCY).  Because Judge Yarbrough

agreed that ALJ Lindsay erred in analyzing the mental health opinions, he reversed as to that

issue and declined to reach the remaining issues.  *Id.*  In his analysis, Judge Yarbrough found

reversible error with respect to ALJ Lindsay's evaluation of Dr. Krueger's opinion.[26]  *Id.*  Judge

Yarbrough further explained

> The ALJ's lengthy discussion of the mental health opinions from Ms. Lovelace,
> Dr. Solomon, and Dr. Krueger indicates that the ALJ at least *considered* that they
> were consistent with one another.  The Court therefore rejects Plaintiff's argument
> that the ALJ failed to consider this factor.  However, Plaintiff's argument implicates
> a different problematic aspect of the ALJ's discussion.  Every mental health opinion
> the ALJ discussed assigned Plaintiff significant functional impairments related to
> her mental health conditions.  AR 516-21.[]  This leaves the Court wondering what,
> exactly, constitutes the substantial evidence for rejecting the severe functional
> limitations in every mental health opinion the ALJ considered.

Tr. 1049-1050 (emphasis in original).  Judge Yarbrough noted in a footnote that

> [o]nly the state agency non-examining psychological consultants opined that
> Plaintiff can perform simple work without any significant limitations.  AR 82, 97.

---

[26] Judge Yarbrough found that there were problems with the ALJ's evaluation of Dr. Solomon's opinion, but did not
determine whether they constituted reversible error on their own.  Tr. 1045.  Judge Yarbrough agreed, however, that
ALJ Lindsay had improperly rejected a portion of Dr. Krueger's opinion for illogical and speculative reasons, and
improperly mischaracterized the basis of Dr. Krueger's assessed limitation of Ms. Laney's ability to adjust to changes
in the work environment.  Tr. 1048.

> But the ALJ did not rely on these state agency consultant opinions as substantial evidence for her decision – the ALJ did not even discuss these opinions at step four.

*Id.*

Here, Ms. Laney argues the ALJ violated Judge Yarbrough's mandate as to her evaluation of Dr. Solomon's opinion because (1) Dr. Solomon's treatment notes are "largely illegible" and triggered a duty for the ALJ to contact Dr. Solomon for clarification which she failed to do; (2) the ALJ failed to assess the supportive notes and letter Dr. Solomon provided with her assessment of Ms. Laney's ability to do work-related mental activities; and (3) the ALJ erred in her determination that Dr. Solomon's opinion is inconsistent with other substantial evidence, *i.e.,* that Ms. Laney was diagnosed with hallucinations and memory disturbance and that the non-examining State agency psychological consultants found similar moderate and marked limitations as Dr. Solomon.  Doc. 14 at 16-18.  As to the ALJ's evaluation of Dr. Krueger's opinion, Ms. Laney argues, without more, that the ALJ violated Judge Yarbrough's mandate because she erred in her determination that Dr. Krueger's opinion is inconsistent with other substantial evidence.  *Id.*

The Commissioner asserts that the ALJ evaluated and weighed Dr. Solomon's and Dr. Krueger's opinions in accordance with the correct legal standards thus complying with the remand mandate and that the ALJ's conclusions are supported by substantial evidence such that this Court should affirm her decision.  Doc. 20 at 8-15.  Addressing Ms. Laney's arguments, the Commissioner asserts that the ALJ did not find Dr. Solomon's notes illegible nor did she assign Dr. Solomon's opinion little weight for that reason.  *Id.* at 10.  The Commissioner asserts, therefore, that this is not grounds for remand.  *Id.*  The Commissioner next asserts that the letters Dr. Solomon attached to her Medical Source Statement were narrative descriptions of Ms. Laney's condition, but did not contain any evidence or explanation of diagnostic techniques

21

or laboratory findings related to Ms. Laney's mental function that the ALJ failed to consider. *Id.* at 11. The Commissioner asserts that the ALJ properly relied on Dr. Solomon's treatment notes which contained mental exam findings to determine that Dr. Solomon's assessed limitations were inconsistent with her own notes and therefore not supported. *Id.* Last, the Commissioner asserts that Ms. Laney's argument that the ALJ erred in her determination that Dr. Solomon's opinion is inconsistent with other substantial evidence is an improper request for the Court to reweigh evidence and overlooks that not all of the opinion evidence was consistent. *Id.*

As for Dr. Krueger's opinion, the Commissioner asserts that Ms. Laney's one-sentence argument should be waived as conclusory and underdeveloped. Doc. 20 at 12-14. But even if not waived, the Commissioner asserts that the ALJ explained that Dr. Krueger's assessment of moderate to marked limitations in various areas of functioning was inconsistent with his mental status exam notes and inconsistent with the overall record that demonstrated "normal memory, normal thoughts, normal attention, and good concentration." *Id.* Accordingly, the Commissioner asserts that the ALJ reasonably assigned Dr. Krueger's opinion little weight based on substantial evidence and that Ms. Laney has not identified any specific flaw with the ALJ's analysis warranting remand. *Id.*

In her Reply, Ms. Laney reargues that the ALJ had a duty to contact Dr. Solomon based on the alleged illegibility of her notes and to not do so amounts to the ALJ picking and choosing through the evidence. Doc. 25 at 4. Ms. Laney reargues that the ALJ's failure to specifically discuss the letters Dr. Solomon prepared on Ms. Laney's behalf demonstrates the ALJ did not consider all the evidence. *Id.* at 4-5. Ms. Laney argues that the ALJ's analysis of Dr. Solomon's opinion failed to specifically discuss any inconsistency in Dr. Solomon's treatment notes or the record at large related to Dr. Solomon's assessment of Ms. Laney's ability to perform activities

within a schedule, maintain regular attendance and be punctual, and to respond appropriately to expected or unexpected changes in the work setting. *Id.* at 5-6. As to Dr. Krueger's opinion, Ms. Laney argues that the ALJ improperly discounted Dr. Krueger's opinion based on normal results recorded in Dr. Como's consultative medical exam note. *Id.* at 6-7. Ms. Laney also argues that the "Commissioner does nothing to expound upon the ALJ's consistency analysis except to argue that it was supported by substantial evidence." *Id.* at 9.

a.    **Applicable Legal Standards**

The "mandate rule" doctrine provides that "there must be compliance with the reviewing court's mandate." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (quoting *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 114 F.3d 1513, 1520 (10th Cir. 1997)). This doctrine "appl[ies] to judicial review of administrative decisions, and 'requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart.'" *Id.* (quoting *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir.1998)). In addition, the regulations provide that, in the event of a remand order, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b).

The ALJ is required to evaluate every medical opinion she receives that could have an effect on the RFC. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-62 (10th Cir. 2012); *Doyal v. Barnhart*, 331 F.3d 7598, 764 (10th Cir. 2003). For claims filed before March 27, 2017, as is the case here, a unique two-step rule applies to the opinions of treating physicians (acceptable medical sources who provide or have provided the claimant with medical treatment and who have an ongoing relationship with the claimant).

First, the ALJ must determine whether the opinion is entitled to "controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." *Id.* (internal quotation marks omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* If it is not given controlling weight, "at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).[27]

The ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, the decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted). The Tenth Circuit has also expressed this as a requirement that the ALJ provide "specific and legitimate reasons" for rejecting an opinion. *Doyal*, 331 F.3d at 764; *Watkins*, 350 F.3d at 1301. The ALJ's reasons are reviewed for substantial evidence. *Doyal*, 331 F.3d at 764.

---

[27] The factors in the regulation are (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which the opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

**b.      The ALJ Followed the Mandate and Considered the Mental Health Opinions Applying the Proper Legal Standards**

This matter was remanded "for a reconsideration of the mental health opinions following the proper legal standards." Tr. 1050. The Tenth Circuit has stated that the ALJ considering a case on remand is not bound to an earlier decision. *Campbell v. Bowen*, 822 F.2d 1518, 1521-22 (10th Cir. 1987). "To hold otherwise would discourage administrative law judges from reviewing the record on remand, checking initial findings of fact, and making corrections, if appropriate." *Id.* at 1522. *See Miller v. Barnhart*, 175 F. App'x 952, 955-56 (10th Cir. 2006) (holding that when the ALJ's decision stands as the final decision of the Commissioner, federal courts should review the ALJ's decision under the usual Social Security standards, "rather than focusing on conformance with the particular terms of the [Appeals Council's] remand order"); *Hamlin v. Barnhart*, 365 F.3d 1208, 1224 (10th Cir. 2004) (stating that "[i]t was certainly within the ALJ's province, upon reexamining [claimant's] record [after district court and Appeals Council remand], to revise his RFC category"); *Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989) ("Once the case was remanded to the ALJ to gather more information about the extent of [claimant's] disability, the ALJ was free to reevaluate the facts.").

The Court finds no error with the ALJ's analysis of the mental health opinion evidence and that the ALJ, therefore, followed the mandate. The Court addresses Ms. Laney's arguments in turn.

**(i)      Duty to Recontact**

The Court finds the ALJ did not have a duty to recontact Dr. Solomon based on "illegible notes."[28] The applicable regulation provides that a medical source may be recontacted at the

---

[28] Ms. Laney cites *Bryant v. Astrue*, 2007 WL 2377079 (D. Kan. Aug. 14, 2007), to support her argument that illegible treatment notes require recontacting the medical source. Assuming arguendo and without addressing relevant factual

discretion of the ALJ or agency adjudicators if it is determined that the evidence for determining

disability is inconsistent or insufficient.  *See* 20 C.F.R. § 404.1520b(2)(i).  Ms. Laney has not

provided any evidence that the ALJ made such a determination of inconsistency or insufficiency

in the evidence for determining disability such that she abused her discretion in deciding to not

recontact Dr. Solomon.  The Court, therefore, finds no error as to this issue.

### (ii)     Dr. Solomon's February 24, 2015, Letter

The Court finds the ALJ did not ignore probative or uncontroverted evidence in

evaluating Dr. Solomon's assessment of Ms. Laney's ability to do work-related mental activities.

Ms. Laney argues that the ALJ failed to specifically discuss Dr. Solomon's February 24, 2015,

letter to the Social Security Administration which she argues provides support for Dr. Solomon's

opinion.   Ms. Laney specifically highlights from that letter (1) Dr. Solomon's PTSD diagnosis

and her conclusion that Ms. Laney's work disability "is primarily due to the ongoing

environmental illness that causes her severe physical and cognitive symptoms whenever she is

exposed to materials that are toxic to her"; (2) Dr. Solomon's experience of working with Lyme

and other tick-borne diseases in the psychiatric context; and (3) Dr. Solomon's summary of

---

and procedural differences presented in *Bryant* that are distinguishable from this case, *Bryant* applied a regulation for recontacting a medical source that has been amended and is not applicable to this case.  In February 2012, the agency deleted the regulations which required the agency to recontact treating sources where medical information was unclear or inadequate.  77 Fed. Reg. 10651-01 (Feb. 23, 2012) (deleting former 20 C.F.R. §§ 404.1512(e), 416.912(e)).  New regulations suggest only that the agency *may* recontact a medical source to address perceived inconsistencies or insufficiencies in the evidence when determining disability and extend greater discretion to ALJs and agency adjudicators in doing so.  *See* 20 C.F.R. §§ 404.1520b(b); 416.920b(b).

Ms. Laney also argues that Judge Yarbrough found Dr. Solomon's handwritten notes "mostly illegible."  Doc. 14 at 16.  Indeed, Judge Yarbrough noted in a footnote that "[t]he Court found the handwritten notes mostly illegible," but went on to note that "both parties and the ALJ largely agree about what they say."  Tr. 1041.  This Court found Dr. Solomon's handwritten notes mostly legible, and her mental status exam findings and diagnoses to be legible.  Further, there is no dispute that Dr. Solomon diagnosed Ms. Laney with PTSD and assessed Ms. Laney's ability to do work-related mental activities based on that diagnosis, along with Ms. Laney's "ongoing environmental illness."  Tr. 475.

Ms. Laney's symptoms as reported by Ms. Laney, *i.e.,* joint pain, extreme fatigue requiring

12-16 hours of sleep, brain fog, and difficulty concentrating.  Doc. 14 at 17.

The Court finds that even though the ALJ did not specifically distinguish the

February 24, 2015, letter, the ALJ's discussion of the evidence demonstrates she considered its

content.  *See Clifton*, 79 F.3d at 1009-10 ("[t]he record must demonstrate that the ALJ

considered all of the evidence, but an ALJ is not required to discuss every piece of evidence" and

"in addition to discussing the evidence supporting h[er] decision, the ALJ also must discuss the

uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative

evidence [s]he rejects.").  Here, the ALJ affirmatively stated she carefully considered the medical

record evidence and Ms. Laney's subjective allegations of her symptoms.  Tr. 952, 956.  *See*

*Hackett v. Barnhart*, 395 F.3d 1168, 1172-73 (10th Cir. 2005 ("[O]ur general practice ... is to take

a lower tribunal at its word when it declares that it has considered a matter.").  The ALJ

identifies Dr. Solomon as a "treating source" and cites "Ex. 15F" when evaluating

Dr.  Solomon's opinion.  Tr. 955.  Exhibit 15F includes Dr. Solomon's Medical Source

Statement, the February 24, 2015, letter to the Administration, and Dr. Solomon's September 30,

2014, letter to Dr. Cardasis.  Tr. 471-78.  The ALJ determined at step two that Ms. Laney had

severe impairments of chemical sensitivity, depressive disorder, PTSD, and chronic Lyme

disease.  Tr. 948.  As such, the ALJ did not ignore Dr. Solomon's PTSD diagnosis or her opinion

that Ms. Laney experienced "ongoing environmental illness."  Additionally, the ALJ discussed

Ms. Laney's subjective allegations of her symptoms as follows:

> . . .  As a result of her alleged symptoms, she alleges limitations in lifting, bending,
> standing, reaching, walking, sitting, memory, completing tasks, concentration,
> understanding, following instructions, using her hands, and getting along with
> others.  In particular, she states she can lift no more than 5-15 pounds, can stand no
> more than an hour, and can walk no more than 30-40 minutes (or if she is not well,
> no more than an eighth of a mile before having to rest for several hours).  She states

she does not handle stress or changes in routine well. She states she requires a flexible part-time work schedule which will allow her to spend time in bed as needed. She states she must sleep 12-14 hours a day. She states she cannot tolerate exposure to pesticides or harsh cleaning chemicals, nor to any person using "scented body care products, including laundry detergents."

Tr. 952. As such, the ALJ did not ignore the contents of Dr. Solomon's letter in this regard.

The ALJ ultimately found, however, that the objective medical evidence was not entirely consistent with Ms. Laney's allegations of debilitating symptoms.

[T]he objective medical evidence is not entirely consistent with the claimant's allegations of debilitating symptoms. Of particular note, her exertional allegations are inconsistent with the findings of generally normal strength (except for one positive findings of weakness at the consultant exam), normal gait, normal ROM, and no tenderness. Her allegations of needing 12-14 hours sleep, and of needing a flexible part-time work schedule, are inconsistent with the generally normal physical exams, and with the fact that, while she did complain of fatigue during the relevant period, treatment was sporadic and conservative. Her fatigue complaints are adequately accommodated here by the limitation to light work with no hazardous activities, no commercial driving, and no fast paced assembly line work. Her allegations regarding the severity of her chemical sensitivity are inconsistent with the fact that she did not exhibit any symptoms while being seen by various providers, in environments where cleaning chemicals would have been used, and was in fact noted to be in no acute distress at her appointments. Her mental allegations are inconsistent with her good concentration at the consultative medical exam, normal findings per the treatment record (including normal attention), and average digit span performance.

Tr. 953-54. Thus, for this reason[29] and others, the ALJ found Dr. Solomon's opinion was inconsistent with substantial evidence. Tr. 955; *see* Section III.A.4., *supra.*[30]

---

[29] Ms. Laney has not raised any issue with respect to the ALJ's analysis of Ms. Laney's subjective allegations of her symptoms.

[30] The ALJ further explained that

I fully considered the claimant's subjective allegations of her symptoms pursuant to the requirements of SSR 16-3p. SSR 16-3p does not require[] that I accept at face value all of a claimant's allegations of disabling symptoms, but requires that I assess those allegations in the context of all of the evidence available to me. The claimant's allegations of her symptoms are generally of the sort that could be observed through clinical examinations, such as dizziness, lack of balance, fatigue, difficulty with breathing, focus, and concentration, and word-finding difficulties. However, the medical evidence in this case does not demonstrate such clinical observations, even in settings where chemical cleaning products are in significant use, such as

In sum, the Court finds the ALJ considered the evidence contained in Dr. Solomon's February 24, 2015, letter when she evaluated Dr. Solomon's opinion. The Court, therefore, finds no error.

### (iii)   Inconsistency

Ms. Laney last argues that the ALJ erred in finding that Dr Solomon's opinion was inconsistent with substantial evidence. In support, Ms. Laney points to evidence of hallucinations and memory disturbance documented in the July 2013 treatment notes and states that the nonexamining State agency psychological consultants found "moderate to marked limitations in the same areas of Dr. Solomon." Doc. 14 at 18. The Court is not persuaded.

As to the former, Ms. Laney cites evidence of her July 24, 2013, presentation to Carolina Center for Integrative Medicine, P.A., where she caw Carrie Yerkes, P.A., and complained of

---

medical offices. As discussed in detail above, there are limited positive physical or mental findings on examination and the claimant is never noted to be in acute distress, in circumstances where, based on the claimant's allegations of her chemical sensitivities, such positive findings should have been observable. I also further considered the claimant's limited treatment, the types of treatment and other measures that she utilizes to reduce her symptoms, including giving up her home and living in an isolated way, and her medication (or lack thereof) in assessing her residual functional capacity.

In balancing the claimant's subjective statements with the other evidence in the file, there is sufficient evidence to establish the severity of her medically determinable impairments, and to impose limitations in her residual functional capacity. In assessing her fatigue, complaints of dizziness, and problems with breathing, I limited the claimant to no more than light work, with limited climbing, no hazardous activities, no commercial driving, no fast paced assembly line work, and significant limitations on her exposure to environmental, pulmonary, and chemical irritants, which included rejecting a job provided by the vocational expert involving laundry based on the claimant's allegation that laundry detergent scents trigger her sensitivities. The mental limitations in her residual functional capacity also balance her subjective allegations with the limited objective findings on examination and her limited treatment for her mental impairments. Although the objective findings noted only depression and problems with getting sidetracked, I considered the claimant's allegations of difficulty with memory, word finding, and getting lost in limiting her to simple, routine tasks, simple work decisions, and work being performed in the same location every day. Despite no objective evidence of any difficulties in her interactions with others, due to her concerns about limiting her exposure to chemical sensitivity triggers and her tendency to isolate, I limited her to no more than occasional workplace interactions. The evidence as a whole does not warrant further limitations.

Tr. 956-57.

suspicion of acute tick borne illness and multiple chemical sensitivity.[31]  Tr. 289-94.  PA Yerkes'

treatment note included a chronological health history and "detailed review of systems" as

reported by Mr. Laney.  *Id.*  On physical exam PA Yerkes noted, *inter alia*, no acute distress and

not overtly anxious or depressed.  *Id.*  PA Yerkes' assessment included, *inter alia*, "multi-

symptom complex" and listed eleven separate diagnoses under this heading, one of which was

hallucinations and one of which was memory disturbance.  *Id.*  PA Yerkes' recommended

treatment focused on "stabilization" and "improving cellular functioning and detoxification"

through IV Vitamin C infusions, diet modifications, and Doxycycline.  *Id.*

This record aside, however, Ms. Laney cites no other evidence of hallucinations, nor do

subsequent medical records indicate any complaints of or treatment related to hallucinations.  To

the contrary, Dr. Solomon's mental status exams specifically indicate no evidence of

hallucinations.  As such, this record in isolation, which is contrary to Dr. Solomon's own

findings, fails to support Ms. Laney's argument that Dr. Solomon's assessed limitations are

consistent with this evidence.  As for memory disturbance, PA Yerkes' diagnosis arguably is

consistent with Dr. Solomon's assessed limitations based on "cognitive symptoms."  Tr. 475.

But Ms. Laney's argument overlooks that the ALJ found Ms. Laney's subjective allegations of

her symptoms, such as difficulties with concentration and memory, were not entirely consistent

with the objective medical evidence.  To that end, the ALJ discussed Dr. Krueger's consultative

exam report wherein he found Ms. Laney's verbal skills were very good and there was no

evidence of either cognitive disorder or memory problems.  Tr. 950, 953, 955.  The ALJ also

discussed other medical sources who similarly noted normal memory and good concentration on

exam.  *Id.*

---

[31] The ALJ cites this record in her review of the medical evidence record.  Tr. 952.

The Court, therefore, finds Ms. Laney's argument is unavailing as it functions as an invitation to reweigh the evidence before the ALJ, contrary to the charge of the applicable standard of review. *See Deherrera v. Comm'r, SSA*, 848 F. App'x 806, 808 (10th Cir. 2021) (setting out the reviewing court's standard of review and noting that it does not "reweigh the evidence or retry the case"). Recently, the Tenth Circuit eschewed the same type of request:

> [Claimant] advances several individual criticisms of the ALJ's analysis of the evidence, asserting that the medical evidence could have supported a finding of greater disability.... But while these arguments may show the ALJ could have interpreted the evidence to support a different outcome, they, at most, amount to invitations to reweigh the evidence, which [the reviewing court] cannot do.

*Deherrera*, 848 F. App'x at 810.

As for certain consistencies Ms. Laney cites between Dr. Solomon's assessed limitations and the nonexamining State agency psychologist consultant Section I findings, Ms. Laney's argument overlooks the distinction between Section I and Section III findings in the MRFCA. In short, Section I provides a "worksheet to ensure that [a consultant] has considered each . . . pertinent mental activit[y] and the claimant's . . . degree of limitation," POMS § DI 25020.010(B)(1), while Section III is used by medical consultants to record their "formal mental RFC assessment" and is assessed by adjudicators as such. *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015). With this distinction in mind, Drs. Gucker and Mohney found in Section I of the MRFCA, *inter alia,* that Ms. Laney had a *moderate limitation* in her ability (1) to maintain concentration for extended periods and (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[32] These two findings are consistent with two

---

[32] Ms. Laney argues that that Dr. Gucker's and Dr. Mohney's findings reveal moderate *to marked* limitations consistent with Dr. Solomon's opinion. This is not correct. Neither Dr. Gucker nor Dr. Mohney found any marked limitations in Section I of their MRFCAs.

of the moderate limitations Dr. Solomon assessed. However, Drs. Gucker and Mohney ultimately assessed in Section III that Ms. Laney could perform simple work and "attend and concentrate for two hours at a time," which the ALJ relied on as substantial evidence to support her RFC finding.[33] As such, Ms. Laney's reliance on these "consistencies" is misplaced. Moreover, Ms. Laney has not raised any issue related to the ALJ's reliance on the consultant's Section III assessment as substantial evidence in determining Ms. Laney's RFC.

Finally, Ms. Laney argues that the ALJ's consistency analysis of Dr. Krueger's opinion is invalid for the same reasons to that of Dr. Solomon. In addition, in her Reply, Ms. Laney adds that the ALJ improperly accorded more weight to consultative medical examiner Jennifer Como, M.D.'s finding that Ms. Laney's "memory was good and concentration was good," than to Dr. Krueger's opinion that Ms. Laney had marked limitations in her ability to sustain pace and persistence in the work place. Doc. 25 at 6-7. As to the former and for the same reasons discussed above, the Court finds no error in the ALJ's consistency analysis of Dr. Krueger's opinion. As to the latter, Dr. Krueger observed on mental status exam, *inter alia*, that Ms. Laney reported some difficulties with concentration and memory, but that she was able to accurately repeat 5 digits forward and 6 digits backward, and "[s]he obtained a scaled score of 10 on Digit Span, and this suggests that she is functioning within the average range in terms of her immediate recall memory skills." Tr. 302. Thus, in according Dr. Krueger's opinion less

---

[33] The Tenth Circuit has specifically addressed the ALJ's responsibility in evaluating a State agency psychological consultant's MRFCA in light of the instructions printed on the forms and certain sections of the POMS that describe the separate functions of Sections I and III. Tenth Circuit case law instructs that an ALJ may not "turn a blind eye to moderate Section I limitations" and that

> [i]f a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding.

*Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished)

weight, the ALJ explained that Dr. Krueger's own observations and findings on mental status exam, along with other evidence in the record including Dr. Como's consultative physical exam report, were inconsistent with Dr. Krueger's assessed limitations.[34]  Ms. Laney, therefore, has not demonstrated that the ALJ improperly relied on Dr. Como's medical exam finding over that of Dr. Krueger's to accord less weight to Dr. Krueger's opinion.

For all of the foregoing reasons, the Court finds that the ALJ followed the mandate and considered the mental health opinions applying the proper legal standards.  As such, there is no error.

## 2.    Conflict and Significant Number of Jobs

Ms. Laney argues that the ALJ erred at step five of the sequential analysis by failing (1) to resolve an apparent conflict between the VE's testimony and the DOT regarding the GED reasoning level three of mail clerk and the ALJ's restriction of Ms. Laney's ability to do work-related mental activities to simple work; and (2) to conduct a significant numbers analysis under the factors set forth in *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).  Doc. 14 at 19-25.  Ms. Laney argues that the ALJ's errors are not harmless because eliminating the job of mail clerk leaves only 72,000 available jobs and is too low to justify supplying factual inferences about significance.  *Id.*

The Commissioner asserts that substantial evidence in the record supports the ALJ's finding that Ms. Laney can perform work existing in significant numbers in the national economy.  Doc. 20 at 15-19.  The Commissioner asserts that the ALJ obtained VE testimony to assist in determining whether work existed in significant numbers and that the VE identified three jobs that Ms. Laney could perform.  *Id.*  The Commissioner asserts that the ALJ asked

---

[34] *See* fn. 10*, supra*.

whether the VE's testimony was consistent with the DOT and the VE affirmatively confirmed there were no conflicts. *Id.* The Commissioner further asserts that the ALJ was under no obligation to perform a *Trimiar* analysis because the focus here was on national jobs and the Tenth Circuit has repeatedly affirmed ALJ findings involving far fewer than 119,000 jobs. *Id.* Finally, the Commissioner asserts that even if the Court were to set aside the occupation of mail clerk, the two remaining occupations the VE identified have job numbers in excess of the number of jobs that both this Court and other courts within the Tenth Circuit have held to be significant, and that regardless of their combined total, the ALJ made specific factual findings that each occupation, standing alone, represented a significant number nationally. *Id.*

To begin, the Court finds that even assuming arguendo that the ALJ failed to resolve an apparent conflict between the VE's testimony and the DOT with respect to the mail clerk's reasoning level requirement and the ALJ's assessment of Ms. Laney's ability to do work-related mental activities, this error is harmless and need not be resolved for two reasons. First, there is no dispute that substantial record evidence supports the ALJ's conclusion that Ms. Laney can perform work as an office helper and tagger. Second, for the reasons discussed below, there remains a significant number of jobs in the national economy that Ms. Laney can perform. *See Evans v. Colvin*, 640 F. App'x 731, 736 (10th Cir. 2016) (explaining that the Tenth Circuit has held in social security cases that an ALJ's erroneous inclusion of some jobs to be harmless error where there remained a significant number of other jobs in the national economy) (citing cases)).

Next, the Court finds that ALJ was not required to conduct a *Trimiar* analysis to establish that the total job numbers of 119,000 in the first instance were significant. In the Tenth Circuit, what constitutes a "significant number[]" of jobs, as that term is used in 42 U.S.C. § 423(d)(2)(A), is not established by a "bright line." *Trimiar,* 966 F.2d at 1330. Rather, "each

case should be evaluated on its individual merits." *Id.* Proper analysis of the question of what amounts to numerical significance does not involve "judicial line-drawing" and "entails many fact-specific considerations requiring individualized evaluation." *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004). Finally, "and, most importantly, . . . the evaluation should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* (internal quotation marks and citation omitted).

In *Trimiar*, the issue was whether 650 to 900 jobs existing in the region constituted a "significant number" for purposes of the statute. 966 F.2d at 1330 (citing 42 U.S.C. § 423(d)(2)(A) (1991)).[35] The Tenth Circuit listed "several factors" borrowed from the United States Court of Appeals for the Eighth Circuit that "go into the proper evaluation of significant numbers." *Id.* (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)). Those factors included (1) the level of claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the distance claimant is capable of traveling to engage in the assigned work; (4) the isolated nature of the jobs; and (5) the types and availability of such work. *Id.* With those factors in mind, the Tenth Circuit ultimately determined that substantial evidence supported the ALJ's decision. *Id.* at 1332.

In subsequent cases, the Tenth Circuit has offered guidance on when those factors apply. In *Raymond v. Astrue*, 621 F.3d 1269 (10th Cir. 2009), the question before the court was whether

---

[35] An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work *which exists in the national economy*, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. 42 U.S.C. § 423(d)(2)(A) (emphasis added).

or not the job of rental clerk existed in significant enough numbers.[36] *Id.* at 177.  In reliance on

*Trimiar*, the claimant argued that a significant number of jobs must exist in the regional economy

and "that the ALJ should have engaged in a multi-factor analysis" to make that assessment.  621

F.3d at 1274, n. 2.  The Tenth Circuit rejected the claimant's argument, holding that the

controlling statutes, federal regulations, and case law all indicate that the proper focus is

generally on jobs in the national, not regional, economy.  *Id.*  The court also distinguished the

facts in *Trimiar* and noted that *Trimiar* does *not* hold that only regional jobs are relevant, or that

a court must engage in a factoral analysis when the number of jobs available is much larger than

the number of jobs that were available in *Trimiar*, *i.e.,* 650 to 900.  *Id.* at 178, n. 2.

This District has taken this direction to mean "that the *Trimiar* analysis does not extend

to the question of whether there are significant numbers of *nationally* available jobs."  *Rodriguez*

*v. Berryhill*, No. 16-CV-1059, 2018 WL 1627209, at *5 (D.N.M. Mar. 31, 2018) (internal

quotation marks and citation omitted).  Indeed, "the multi-factorial analysis required by *Trimiar*

focuses on factors relevant in analyzing the true availability of local job opportunities on a more

particularized inquiry as to the specific claimant under consideration."  *Id.* (alteration, internal

quotation marks and citation omitted).  "Thus, where the focus is on the national availability of

jobs[,] the particularized *Trimiar* inquiry would confuse the issues."  *Id.* (alteration, omission,

internal quotation marks, and citation omitted).  The Court is guided by this standard.

Here, the VE testified and the ALJ made a finding only as to jobs within the national

economy.  Accordingly, because only work within the national economy is at issue, the Court

decides if substantial evidence supports the ALJ's determination that Ms. Laney was "capable of

---

[36] The Court found it was undisputed "that there are some 1.34 million rental clerk jobs available in the national economy and 385 in the New Mexico economy."  *Raymond*, 621 F.3d at 1274.

making a substantial adjustment to other work that exist[ed] in significant numbers in the national economy."  Tr.  958; *see Mares v. Berryhill*, No. 18-CV-4, 2019 WL 1085193, at *4-5 (D.N.M. Mar. 7, 2019) (declining to remand for a *Trimiar* analysis where the number of jobs in the national economy was at issue, and focusing instead on whether the ALJ's determination at step five of the sequential evaluation was supported by substantial evidence); *see also Rodriguez*, 2018 WL 1627209, at *6 (clarifying that, when *Trimiar* does not apply, it "does not mean that an ALJ's findings regarding the number of jobs existing in the national economy is beyond scrutiny" because "the issue remains as to whether the ALJ's finding is supported by substantial evidence").

In *Mares*, the VE testified that a hypothetical individual with the same characteristics as the claimant "could perform the duties of a table worker, document preparer, and addresser." 2019 WL 1085193, at * 4.  The VE further testified that, taken together, these three occupations totaled 55,900 jobs in the national economy.  *Id.*  In light of this testimony, the ALJ determined "that these jobs existed in significant numbers in the national economy."  *Id.* The claimant appealed, arguing, *inter alia*, "that the total number of jobs is so borderline to a significant number that the ALJ was required to conduct a *Trimiar* analysis, which she did not do."  *Id.* Ms. Laney echoes this argument in the instant case, and the Court rejects it.

In upholding the ALJ's determination that 55,900 jobs in the national economy was numerically significant, *Mares* offered a survey of what various circuits, including the Tenth Circuit, and this District deem satisfy 42 U.S.C. § 423(d)(2)(A)'s call for "significant numbers." It noted that in *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528-29 (9th Cir. 2014), the Ninth Circuit held that 25,000 jobs adequately answered this call; in *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997), the Eighth Circuit held that 30,000 jobs did the same; and likewise, in *Rogers v.*

*Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009), this Court's home circuit "implicitly found 11,000 nationally available jobs to be a significant number." *Mares*, 2019 WL 1085193, at *5. Further, in *Rodriguez*, 2018 WL 1627209, at *5-6, a total of 55,600 jobs was found to suffice; in *Garcia v. Berryhill*, No. 16-CV-1266, 2018 WL 1620922, at *5-6 (D.N.M. Mar. 31, 2018), a total of 17,600 jobs was found to suffice; in *King v. Berryhill*, No. 16-CV-1147, 2018 WL 851358, at *12-14 (D.N.M. Feb. 12, 2018), a total of 47,500 jobs was found to suffice. *Mares*, 2019 WL 1085193, at *5. Likewise, in *Padilla v. Berryhill*, No. 16-CV-106, 2017 WL 3412089, at *11-12 (D.N.M. Mar. 28, 2017), an aggregate of 27,000 jobs in the national economy was deemed sufficient. *Padilla* relied on the Tenth Circuit's holding in *Rogers*, mentioned above, and its holding *Botello v. Astrue*, 376 F. App'x. 847, 849-51 (10th Cir. 2010): "The *Botello* court . . . upheld the ALJ's significant numbers ruling based solely on the number of jobs the VE identified as available in the national economy." 2017 WL 3412089, at *12.

In light of the foregoing, the Court concludes that ALJ's determination with respect to Ms. Laney's ability to adjust to jobs that existed in numerical significance in the national economy is supported by substantial evidence. The ALJ gave due consideration to the VE's testimony, and between the two remaining jobs for which there is indisputably no conflict there are 72,000 jobs that exist in the national economy that someone with Ms. Laney's limitations can perform - a number well within the range what has repeatedly been found to constitute "significant numbers" under 42 U.S.C. § 423(d)(2)(A). Therefore, the Court will not disturb the ALJ's judgment on this issue.

## IV.  Recommendation

For all of the reasons stated above, the Court finds that Ms. Laney's Motion is not well taken. The Court, therefore, recommends that the Motion be **DENIED.**

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**